## THE HILARIUS.

(District Court, E. D. New York. June 14, 1908.)

1. SHIPPING—INJURY TO STEVEDORE—BREAKING OF WINCH—LIABILITY OF VESSEL.

An injury to a stevedore resulting from the breaking of a winch being operated by another stevedore, even if due to the fact that the machinery was not kept properly oiled, cannot be charged to the negligence of the vessel which furnished the winch, where no complaint was made as to its condition or notice given to the officers by the winchmen.

[Ed. Note.—For cases in point, see Cent. Dig. vol. 44, Shipping, § 350.]

2. SAME—EVIDENCE CONSIDERED.

Evidence considered, and held insufficient to charge a vessel with liability for the breaking of an eccentric strap on a winch, by which a stevedore was injured, but rather to show that the breaking was caused by the improper manner in which the winch was operated by the winchman, who was a fellow servant with the stevedore injured.

[Ed. Note.—For cases in point, see Cent. Dig. vol. 44, Shipping, § 357.]

In Admiralty. Suit for injury to stevedore.

Wilford H. Smith, for libelant.
Convers & Kirlin and Charles R. Hickox, for claimant.

CHATFIELD, District Judge. The libelant alleges fault on the part of the steamship because of the breaking of an eccentric strap due to a defective condition of a winch, while the claimant makes a general denial, alleges contributory negligence, and also claims that the accident was occasioned through the acts of a fellow servant, or through the improper management of the winch by the winchman, who was in the service of the stevedore and not of the steamship. The allegations of fault were with relation to the condition of this eccentric strap, and, as the case finally went to trial, must be gathered from the evidence rather than the pleadings. The allegations of fault were indefinite, but the claimant answered ready, and no motion was made with respect to these allegations until after the libelant had begun his case.

The testimony for the libelant shows that the winch made a rattling noise on the Saturday preceding the accident, and the winchman testifies that on Monday his reversing lever worked hard. The expert produced for the libelant testified, after inspecting the broken strap, that the break might have been occasioned through lack of oil, because of which the strap might have become heated, and sufficient friction have resulted to cause the break; but this expert also testified that the strap might be broken by reversing the lever when the steam pressure was on. We can dismiss the question of the rattle, for the libelant's expert testified that, if the strap was in the condition in which it was produced at the trial, none of the bolts had worked loose, and all of the testimony shows that the condition of the strap had not been changed in any way since the accident. The claimant has produced the affirmative testimony of two officers of the ship, to the effect that the winchman at all times when operating this winch, and even immediately preceding the accident, ran the winch and low-

ered the draft at a high rate of speed. These witnesses say that, when each draft of rails had been raised to a position over the hatch, the winchman ran the draft down under a full head of steam, and then reversed his lever without shutting off steam. The experts for the claimant and libelant each testified that this would of itself be likely to break the eccentric strap or some other portion of the engine. One of the doubtful points in the case is that the testimony of the claimant's witnesses is so positive upon this point that it is hard to explain why the winch did not break previous to the accident, if it had been continuously used in this manner. The winchman, on the other hand, testified that he started the drafts down, shut off the steam, and let the weight of the draft operate the winch without steam until the draft reached a point where a signal was given to the winchman, and that he then stopped the fall with his reversing lever, and again turned the steam on slowly to start the winch, in order that the rails might be drawn under the coaming of the hatch to the position where they were to be loaded. There is no evidence to sustain the libelant's contention that the accident was caused through lack of oil, except that the libelant's expert has stated it might have occurred in that way, and it seems to the court that the need of oil would create a condition of the winch which should be called to the attention of the officers of the steamer by the winchman, and neglect to remedy the condition after due notice must be shown before the vessel can be held liable therefor. The testimony shows that the winch was oiled before work was begun on Monday morning, and an overheating or use of the winch when dry, under the guidance of an experienced winchman, cannot be deemed negligence on the part of those furnishing the machinery, if the winchman allowed the condition to go on and said nothing. The St. Gothard, 153 Fed. 855, 83 C. C. A. 37.

A difference of opinion and of testimony has arisen over the question whether the load of two rails would run down if the winch were set in what may be called reversed position without the application of steam, and, as has been said, the claimant alleges that the winchman not only reversed his lever and started the fall down, but also stopped the cable at the bottom with a full head of steam throughout the entire operation. It is unnecessary to determine this point, although there would seem to be a preponderance of the testimony indicating an improper or careless handling of the winch by the winchman in order to make rapid progress. If the winchman so handled his winch as to reverse his lever with the steam on, and thus produced a condition which all of the experts admit would break the winch, then the responsibility for the accident must rest upon the winchman, who is a fellow servant of the libelant. If the accident occurred through applying the steam too rapidly after stopping the fall at the bottom of the hold, again the winchman must be held responsible. Taking the winchman's story as true, and assuming that no steam pressure was on at the time of the accident, and that the break occurred merely by stopping the run of the fall when he received the signal from the man at the hatch, it is impossible to gather from the testimony any explanation of what occurred which would throw liability upon the officers of the steamer. Perhaps the winchman should have used

steam, and the engine thus have been kept in control, if it can be believed that the fall would run down under the weight of the draft. Perhaps the winch was not able to withstand the shock of a sudden stoppage or reversal of the lever under such conditions, but the steamship officers were not responsible for the manner of using the winch (The Baron Innerdale [D. C.] 93 Fed. 492; The St. Gothard, supra), and, in fact, the testimony shows that they did complain and warn the stevedores as to the method of operation by the winchman.

The whole weight of the testimony is against any negligence on the part of the steamer or its officers, and this makes it unnecessary to consider whether the libelant was guilty of contributory negligence, although it may be said that the position in which the libelant was found after the accident, inasmuch as the testimony shows plainly that he was struck by the rails under the effect of a sudden jerk, rather than by being in their way as they ran down, is not of itself sufficient upon which to base contributory negligence so as to prevent a recovery.

The libel must be dismissed.